RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 12a0067p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

NATIONAL LABOR RELATIONS BOARD,
             *Petitioner/Cross-Respondent,*

SHEET METAL WORKERS INTERNATIONAL
ASSOCIATION, LOCAL UNION NO. 133,
                          *Intervenor,*


             *v.*


GALICKS, INC.,
             *Respondent/Cross-Petitioner.*

Nos. 10-2028/2121

On Application for Enforcement and Cross-Petition
for Review of an Order of the National Labor Relations Board.
Nos. 8-CA-36766; 8-CA-36079.

Decided and Filed: March 2, 2012

Before: GRIFFIN and KETHLEDGE, Circuit Judges; THAPAR, District Judge.[*]

_____

## COUNSEL

_____

**ON BRIEF:** Julie B. Broido, Linda Dreeben, Amy H. Ginn, NATIONAL LABOR
RELATIONS BOARD, Washington, D.C., for Petitioner.  Christopher F. Cariño,
Stephen P. Bond, BROUSE McDOWELL, LPA, Akron, Ohio, for Respondent.  Joseph
M. D'Angelo, COSME, D'ANGELO & SZOLLOSI, Toledo, Ohio, for Intervenor.

_____

## OPINION

_____

AMUL R. THAPAR, District Judge.  The National Labor Relations Board found

that Galicks, Inc. failed to recall its laid-off employees because of anti-union animus,

_____

[*]The Honorable Amul R. Thapar, United States District Judge for the Eastern District of
Kentucky, sitting by designation.

1

unlawfully withdrew recognition from the union, and twice refused to provide requested information to the union in the bargaining process. We must determine whether the circumstantial evidence in the record can shoulder the weight of the Board's inferences. Circumstantial evidence, of course, can be tricky. "It may seem to point very straight to one thing," but if we "shift [our] point of view a little, [we] may find it pointing in an equally uncompromising manner to something entirely different." Arthur Conan Doyle, *The Boscombe Valley Mystery*, *in* The Adventures of Sherlock Holmes 79–80 (New York, Harper & Brothers 1900). When this is the case—as it is here—we must defer to the Board's findings.

## I.

### A.     Factual Background

This is a story about skilled versus unskilled labor—journeymen versus production employees. At its center is Gregory Galigher, the owner of Galicks, Inc., a sheet metal contractor in the construction industry. Beginning in 1979, Galicks was a member of the Akron/Canton/Mansfield Roofing & Sheet Metal Contractors' Association (the "Association"). The Association was a party to successive collective bargaining agreements—called Building Trades Agreements—with Local Union No. 33 of the Sheet Metal Workers International Association (the "Union"). As one of the Association's members, Galicks was bound by these agreements, which required journeymen and apprentices to perform all sheet metal work.

Galicks honored this requirement until 1991 and assigned all sheet metal work to its journeymen; it had no apprentices. Then Galigher hired his son Ed Galigher—a non-journeyman—and assigned him sheet metal work reserved only for journeymen under the Building Trades Agreement. In 1996, he hired another son, Jason Galigher[1]—also a non-journeyman—and similarly assigned him journeyman-only work.

---

[1]The parties' briefs refer to this son as Jake, which appears to be a nickname for Jason. *See, e.g., Galicks, Inc.*, 354 N.L.R.B. No. 39, slip op. at 8; Galicks App'x at 121. Therefore, we refer to him as Jason.

During that same year, the Union proposed an addendum (the "Production Agreement") to the Building Trades Agreement to cover Galicks's production employees. Galicks agreed. The Production Agreement allowed the production employees to become Union members and made the Union their representative. In exchange, the production employees could perform sheet metal work that was otherwise journeyman-only work under the Building Trades Agreement with two limitations. The first limitation was location: production employees could only perform sheet metal work in Galicks's shop, not at jobsites. The second limitation was type: production employees could not fabricate sheet metal products involving "air conditioning, heating and ventilating systems installed in building enclosures to provide human comfort" or any "architectural sheet metal work." *Galicks, Inc.*, 354 N.L.R.B. No. 39, slip op. at 10 (June 30, 2009). Journeymen still had to perform all other sheet metal work. Overall, the Production Agreement allowed Galicks to use lower-wage production workers for some, but not all, of the journeymen work. With this agreement in force, Galicks hired another production employee, Randy Gray, in 1999.

In 2000, Galigher signed a successor Production Agreement. From 2000 to 2005, Galicks continuously employed between one and three journeymen except when it laid off all of its journeymen from August 2002 to December 2003. Despite employing journeymen, however, Galigher continued to assign journeyman-only work to his production employees. Between May and June 2004, Galicks laid off three of its four journeymen. But the production employees still performed journeyman-only work, including on at least two occasions in late 2004 and early 2005 when Union officials personally observed them performing journeyman-only work at jobsites.

In 2005, a squabble broke out: the journeymen wanted to keep their Union membership, but the production employees did not. In January, all of Galicks's production employees gave Galigher a union-disaffection petition, which stated that they no longer wanted the Union to represent them. Galicks, in turn, notified the Union that it was withdrawing recognition from the Union as the production employees' representative. One month later, Galicks withdrew from the Association, which had

served as its bargaining agent for the Building Trades Agreement since 1979. In response, current journeyman Russell Cottis and the three laid-off journeymen endorsed the Union as their representative. Based on this endorsement, the Union asked Galicks in early April to voluntarily recognize the Union as the journeymen's representative. Galicks declined.

Running out of options, the Union petitioned the Board to hold an election of the Union as the journeymen's representative. That same day, Galicks laid off its last journeyman, Russell Cottis. Galicks then agreed to an election, and the four laid-off journeymen unanimously voted for the Union as their representative. On June 3, the Board certified the election results by designating the Union as the exclusive bargaining representative for Galicks's journeymen. Three days later, Galicks hired non-journeyman Curt Paternoster and began giving him work that would have been restricted to journeymen under the Agreements.

Meanwhile, with the latest iteration of the Building Trades Agreement set to expire on May 31, the Union and Association renewed it. The Union believed that its certification as the journeymen's representative made the successor Building Trades Agreement binding on Galicks, even though Galicks had already withdrawn from the Association. Galicks, for its part, acknowledged its duty to bargain with the Union, but rejected that the successor agreement had become binding on Galicks. Steadfast in its belief, the Union requested information from Galicks to help transition from the Production Agreement, which had also expired on May 31, to the successor Building Trades Agreement. Specifically, the Union asked for a list of all work that Galicks had performed since June 2005, a list of its employees, copies of each employee's job sheets, and all of its current and future projects. Galicks refused.

On August 22, 2005, the Union filed a charge with the Board alleging that Galicks was bound to the successor Building Trades Agreement and had unlawfully repudiated it. But the Board dismissed this charge in July 2006 because the successor agreement did not bind Galicks. Back to square one, the Union and Galicks met and bargained for a new agreement to cover Galicks's journeymen.

Shortly thereafter, in August 2006, the Union again requested information from Galicks to facilitate negotiations over a new agreement: a list of its employees, all company personnel policies, a list of all current and future projects, and details of all work completed since June 1, 2005. By this time, Galicks had laid off all of its journeymen, and Galicks said they should not expect a recall because there was not enough journeyman work. So Galicks withdrew recognition from the Union as the journeymen's representative and refused to provide the requested information to the Union.

**B.      Procedural History**

The Union filed four charges against Galicks under Sections 8(a)(1), 8(a)(3), and 8(a)(5) of the National Labor Relations Act. These charges alleged that Galicks refused to recall its laid-off journeymen because of anti-union animus, unlawfully withdrew recognition from the Union, and twice refused to provide requested information to the Union. On June 20, 2007, the Administrative Law Judge ("ALJ") dismissed the failure-to-recall charge, but concluded that Galicks had committed the other three violations.

Both the NLRB's General Counsel and Galicks appealed to the Board, which was in the midst of an identity crisis. Typically, five members appointed by the President and confirmed by the Senate govern the Board. But in December 2007, the terms of two of the Board's four members were about to expire. Anticipating that these vacancies would go unfilled, the four members delegated all of the Board's authority to three of the members, which dwindled to two when one member's recess appointment expired at the end of 2007. This two-member delegee group decided the Board's cases for over two years, including this case. On appeal in this case, the two-member Board went even further than the ALJ. Not only did the Board affirm the three charges for which the judge held Galicks liable, but it also found that Galicks had not recalled its laid-off journeymen because of anti-union animus.

Galicks petitioned this Court for review, and the Board cross-petitioned for enforcement. The Union also intervened in support of the Board. While the case was pending, the Supreme Court held that a two-member delegee group of the Board lacks

statutory authority to exercise the Board's delegated powers. *New Process Steel, L.P. v. NLRB*, 560 U.S. \_\_\_, 130 S. Ct. 2635, 2645 (2010). Consequently, we remanded the case to the Board. *See Galicks, Inc. v. NLRB and Sheet Metal Workers Int'l Assoc., Local Union No. 33*, 383 F. App'x 516 (6th Cir. June 24, 2010) (Nos. 09-1972, 09-2141). A three-member group of the Board affirmed the earlier decision in its entirety. *Galicks, Inc.*, 355 N.L.R.B. No. 68, slip op. at 1 (Aug. 6, 2010). Not surprisingly, the case is now back in front of us.

## II.

We review the Board's factual determinations and its applications of law to facts under a substantial evidence standard. *FiveCAP, Inc. v. NLRB*, 294 F.3d 768, 776 (6th Cir. 2002) (citing *ITT Auto. v. NLRB*, 188 F.3d 375, 384 (6th Cir. 1999)). We must affirm and enforce the Board's decisions if "the record viewed as a whole provides sufficient evidence for a reasonable factfinder to reach the conclusions the Board has reached." *Id.* (quoting *Peters v. NLRB*, 153 F.3d 289, 294 (6th Cir. 1998)). Therefore, we must defer to the Board's reasonable inferences and credibility determinations, "even if we would conclude differently under *de novo* review." *Id.* (citing *ITT Auto.*, 188 F.3d at 384); *see also NLRB v. Taylor Mach. Prods., Inc.*, 136 F.3d 507, 514 (6th Cir. 1998) ("We afford even more deference to Board determinations of credibility and will not normally set aside the Board's choice between conflicting testimony."). The Board is "free to find facts and draw inferences different from those of the ALJ." *Jolliff v. NLRB*, 513 F.3d 600, 607 (6th Cir. 2008) (quoting *Pease Co. v. NLRB*, 666 F.2d 1044, 1047–48 (6th Cir. 1981)).

A minor detour before moving on to the merits: Many circuits, including this one, have regurgitated a curious standard that courts must examine evidence "more carefully in cases where a conflict exists" between the ALJ and the Board. *See, e.g., id.* (quoting *Pease Co.*, 666 F.2d at 1047–48); *Colson Equip., Inc. v. NLRB*, 673 F.2d 221, 223 (8th Cir. 1982); *NLRB v. Ridgeway Trucking Co.*, 622 F.2d 1222, 1224 (5th Cir. 1980); *NLRB v. Colonial Haven Nursing Home, Inc.*, 542 F.2d 691, 703 (7th Cir. 1976). The statement originated in a D.C. Circuit case from 1950, *Joy Silk Mills, Inc. v. NLRB*, 185

F.2d 732 (D.C. Cir. 1950). There, the D.C. Circuit said that when the Board and ALJ disagree, the "evidence must be examined with greater care than when both the [B]oard and the [judge] are in complete agreement." *Id.* at 742.

There are two reasons to stop repeating this standard. First, it is misleading. When the Board does not overturn the ALJ's credibility findings, the sole question for us on appeal is whether substantial evidence supports the Board's findings. Whether the record also supports the ALJ's conclusions is irrelevant to the inquiry. Indeed, as the D.C. Circuit recognized, this "greater care" does not increase the quantum of evidence required to support the Board's findings. This brings us to the second problem: if "greater care" does not change the standard of review, how is it anything more than an empty platitude? The Courts of Appeal exercise the same level of utmost care in reviewing the record in all cases, regardless of whether the Board and ALJ reached opposite inferences and conclusions. We should put this meaningless standard out to pasture.

**III.**

The parties dispute three of the Board's four findings: first, whether Galicks failed to recall its laid-off journeymen because of anti-union animus in violation of Sections 8(a)(1) and 8(a)(3); second, whether Galicks withdrew recognition from and subsequently refused to bargain with the Union in violation of Sections 8(a)(1) and 8(a)(5); and third, whether Galicks failed to provide information requested by the Union in violation of Sections 8(a)(1) and 8(a)(5). Our job is not to decide which party's interpretation of the facts is correct, but only whether there is substantial evidence in the record to support the Board's findings. There is.

**A.     Uncontested Finding**

First, some brush-clearing: Galicks does not challenge the Board's finding that its failure to provide requested information to the Union in August 2005 violated Sections 8(a)(1) and 8(a)(5). By failing to appeal this finding, Galicks has admitted its truth. *FiveCAP*, 294 F.3d at 791 (citing *NLRB v. Gen. Fabrications Corp.*, 222 F.3d

218, 232 (6th Cir. 2000)).  Therefore, we must summarily enforce the Board's order as to this finding.  *See, e.g., id.*; *Gen. Fabrications Corp.*, 222 F.3d at 232; *NLRB v. Autodie Int'l, Inc.*, 169 F.3d 378, 381 (6th Cir. 1999).

**B.          Galicks's Failure to Recall Laid-Off Journeymen**

The National Labor Relations Act prohibits employers from refusing to recall union employees because of anti-union animus.  29 U.S.C. § 158(a)(1), (3).[2]  To determine whether anti-union animus motivated an employer's decision, courts utilize the test first announced in *Wright Line*, 251 N.L.R.B. 1083 (1980).  *See NLRB v. Transp. Mgmt. Corp.*, 462 U.S. 393 (1983) (adopting the *Wright Line* test).  Under *Wright Line*, the General Counsel must establish a prima facie case that anti-union animus at least partly contributed to an employer's failure to recall laid-off employees.  *W.F. Bolin Co. v. NLRB*, 70 F.3d 863, 870 (6th Cir. 1995) (citing *Transp. Mgmt. Corp.*, 462 U.S. at 398–403).  Once the General Counsel establishes a prima facie case of anti-union animus, the burden shifts to the employer to prove "by a preponderance of the evidence that it would have taken the same action even in the absence of protected conduct." *FiveCAP*, 294 F.3d at 778 (quoting *NLRB v. Gen. Sec. Servs. Corp.*, 162 F.3d 437, 442 (6th Cir. 1998)).  Simply showing that the evidence supports an alternative story is not enough.  Galicks must show that the Board's story is unreasonable.  *Accord Island Creek Coal Co. v. NLRB*, 899 F.2d 1222, at *3 (6th Cir. 1990) (unpublished table decision) ("Where a case does not rest on the credibility of witnesses, the Board is 'free to substitute its judgment for the [ALJ's].'" (quoting *Sign & Pictorial Union Local 1175 v. NLRB*, 419 F.2d 726, 734 (D.C. Cir. 1969))).

The Board found that (1) the General Counsel met its burden, and (2) Galicks's reason for its failure to recall the journeymen was pretextual.  Substantial evidence supports the Board's conclusions.

---

[2]Section 8(a)(1) of the NLRA makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of" their rights to collectively bargain.  29 U.S.C. § 158(a)(1). Because specific violations of Sections 8(a)(3) and 8(a)(5) constitute "derivative" violations of Section 8(a)(1), we review only whether the "substantive elements" of Sections 8(a)(3) and 8(a)(5) are supported by substantial evidence.  *NLRB v. Centra, Inc.*, 954 F.2d 366, 367 n.1 (6th Cir. 1992).

(1)     The General Counsel submitted more than enough evidence to establish its prima facie case, including the following:

- In April 2005, Galigher refused to recognize the Union and told two Union representatives that he was "not interested in being union." *Galicks, Inc.*, 354 N.L.R.B. No. 39, slip op. at 2.

- Galligher also indicated the eventual heirs to his company—his sons—likewise were "not interested in being union." *Id.*

- On the same day the Union petitioned for an election in the journeyman unit, he laid off his company's last journeyman.

- Galicks stopped recalling journeymen for work that only journeymen were supposed to do.

- Galicks hired non-journeymen and assigned them journeyman work.

- Galicks unlawfully denied the Union's information request in August 2005.

(2)     Galicks claimed it did not recall journeymen because there was no work to give them. The Board found that this reason was pretextual. The following evidence supports the Board's finding:

- The ALJ found Galigher's testimony that no journeyman work existed "contradictory or evasive." *Id.*, slip op. at 14.

- Other witnesses testified that Galicks had work to give journeymen but did not recall them. The ALJ found this testimony credible.

- Galicks's own invoice summaries indicate that its existing production workers continued to perform journeyman work post-election. *Id.*

- Both the ALJ and the Board found that there was not "any decline in the volume of its business or significant change in the nature of its work" after the election. *Id.*, slip op. at 16; *see also id.*, slip op. at 4.

This large amount of evidence shows that Galicks "expressed hostility towards unionization" with "proximity in time" between the journeymen's union activities and their layoff or failure to be recalled. *FiveCAP*, 294 F.3d at 778 (quoting *W.F. Bolin*, 70 F.3d at 871). The evidence further demonstrates that Galicks "deviat[ed] from past practices" by failing to recall its journeymen, and the record reveals "inconsistencies"

between its asserted justification for doing so and the available documentary evidence. *Id.* In short, the evidence is more than sufficient to support the Board's findings.

But wait, says Galicks, some of this evidence is unreliable. First, Galicks says that only one of the two Board members relied on Galigher's statements as evidence of anti-union animus in the panel's original decision—an outdated argument because two of the three Board members expressly relied on these statements in affirming the decision in light of *New Process Steel. Galicks, Inc.*, 355 N.L.R.B. No. 68, slip op. at 1 n.3 (Aug. 6, 2010) ("Chairman Liebman and Member Pearce do rely on that statement as evidence of union animus."). Second, Galicks argues that Galigher's statements are protected speech under the NLRA and therefore cannot serve as direct evidence of anti-union animus. Galicks Br. at 19–20. We do not need to decide whether the statements qualify as protected speech because even protected speech may serve as "background evidence of anti-union animus." *NLRB v. Vemco, Inc.*, 989 F.2d 1468, 1474 (6th Cir. 1993) (adopting this approach from *Holo-Krome Co.*, 293 N.L.R.B. 594 (1989)). Thus, in combination with the other evidence, Galigher's statements support a finding of animus.

Galicks's other counterarguments are not enough to sever the supporting links between the evidence and the Board's inference that anti-union animus contributed to Galicks's failure to recall its journeymen. Galicks argues that the Board impermissibly overturned several of the ALJ's credibility findings in coming to its conclusion. But the Board expressly upheld all of the judge's credibility findings. *Galicks*, 354 N.L.R.B. No. 39, slip op. at 1 n.3 ("The General Counsel has excepted to some of the judge's credibility findings. . . . We have carefully examined the record and find no basis for reversing the findings."). Galicks also offers a different interpretation of the evidence: by not recalling its journeymen, Galicks was simply adhering to its longstanding practice of assigning journeyman-only work to its production employees. Yet even if adherence to this practice—which violated the Building Trades Agreements with the Union—was a partial motivation, it does not erode the substantial evidence that anti-union animus also contributed to its refusal to recall journeymen.

In conclusion, substantial evidence supports the Board's finding of prima facie animus and pretext. Galicks has not rebutted these findings or shown that the Board's story is unreasonable. Therefore, we must uphold and enforce the Board's finding that anti-union animus motivated Galicks's failure to recall its journeymen in violation of Sections 8(a)(1) and 8(a)(3).

**C.      Galicks's Withdrawal of Recognition From and Refusal to Provide Requested Information to the Union**

Substantial evidence also supports the Board's finding that Galicks unlawfully withdrew recognition from the Union and failed to provide the Union with the information it requested in August 2006. An employer violates Sections 8(a)(1) and 8(a)(5) by "refus[ing] to bargain collectively with the representative of [its] employees," 29 U.S.C. § 158(a)(5), which includes unilaterally withdrawing recognition from a union supported by a majority of the bargaining unit's members, *Vanguard Fire & Supply Co. v. NLRB*, 468 F.3d 952, 957 (6th Cir. 2006). Bargaining in good faith also requires an employer to supply relevant employment information when requested by the employees' representative. *E. Tenn. Baptist Hosp. v. NLRB*, 6 F.3d 1139, 1143 (6th Cir. 1993) (citing *Detroit Edison Co. v. NLRB*, 440 U.S. 301, 303 (1979)).

The Board found that Galicks had a duty to collectively bargain with the Union. It also found that Galicks violated this duty by withdrawing recognition from the Union and failing to respond to the Union's information request in August 2006. Galicks does not dispute that it took either of these latter actions.

Instead, Galicks argues that it did not have a duty to bargain in the first place because it had one or fewer journeymen in the bargaining unit. *McDaniel Elec.*, 313 N.L.R.B. 126, 127 (1993) (holding that there is no duty to bargain if an employer can prove it has a stable one- or no-man bargaining unit). But the Board found that Galicks could not carry its burden of proving a one- or no-man unit of journeymen. *Galicks, Inc.*, 354 N.L.R.B. No. 39, slip op. at 5; *see McDaniel Elec.*, 313 N.L.R.B. at 127 (placing the burden of proving a one- or no-man bargaining unit on the party asserting its existence). Galicks did not prove that it would have recalled one or fewer

journeymen in the absence of the company's anti-union animus.  *Galicks, Inc.*, 354 N.L.R.B. No. 39, slip op. at 5.  Alternatively, the Board found that even if anti-union animus did not contribute to Galicks's failure to recall, the number of Galicks's journeymen fluctuated and so the company could not prove that its one- or no-man unit was stable.  *Id.*  Because the evidence supports the Board's first finding, we need not reach the Board's alternative finding.

We have already held that substantial evidence supports the Board's failure-to-recall finding.  *See supra* Part III.B.  And Galicks offers no evidence to prove how many journeymen it would have recalled absent its anti-union animus.  *Accord NLRB v. MFY Indus., Inc.*, 573 F.2d 673, 675–76 (10th Cir. 1978) (affirming the Board's determination that an employer's withdrawal of recognition from an allegedly one- or no-man bargaining unit was unlawful because the court agreed that anti-union animus motivated the employer's refusal to reinstate three employers into the bargaining unit).  Therefore, substantial evidence also supports the Board's conclusions that Galicks had a duty to bargain with the Union and that its actions violated this duty.

\* \* \* \* \*

For the reasons stated, we **ENFORCE** and **AFFIRM** the Board's Order.